Plaintiff Appellant, Building Graphics Incorporated Lennar Corporation How long before the scouts went out, as you call them, did Mr. Snodgrass come up with the plans that are in question in this case? There are three separate sets of plans. The first set of plans, the Chadwick, was designed in 1993 for a builder that went out of business and did not build any homes beginning in 1995. The second set of plans was designed, I believe, in 1997, and the third set of plans was designed in 1998. The evidence is that drafting and design began working on the challenge plans in 2001. Was that before or after the talent scouts went out to see what was being built in the area? Your Honor, there's really not a great deal of evidence regarding the timing of when the talent scouts would go out. I mean, what the testimony was was about habitual practices, because there was nobody around who was able to testify specifically about where the talent scouts were going, who were scouting to put homes in the neighborhoods where these challenge homes were going to be put. There's no specific testimony about that. There's just testimony about what habitual practices were. And the habitual practice was before you go into a new neighborhood, that's when you conduct your scouting. We're talking about a period of about three to four years. For two of the designs. For two of them. Yes, and then for the other one, which is the floor plan design. More like seven or eight. Six or seven years. That's correct. And what we have, so that's the evidence of the circle, you know, where the defendants were looking. What we have as far as what they might have found is merely with respect to the two elevation design plans, the Ballantrae and the Springfield. There's evidence, there's photographs of built versions of both of those homes in the record. But there's no information regarding where those homes were placed. So they could have been placed in Texas, they could have been placed, you know, somewhere in Charlotte. What the plaintiff is trying to say is, well, you can presume that perhaps they were placed somewhere in Charlotte because they were built by a designer that was based in Charlotte, or by a builder that was based in Charlotte. But that's the only information that they have. With respect to the Chadwick, the information is even more sketchy than that. There's a dispute about whether there's any evidence that a home built from the Chadwick floor plan was ever built. But the court doesn't need to really resolve that dispute. It's the same issue. If a home was built, we don't know where. And there's no evidence that would point the court there. So in looking at whether the paths of Lennar's due diligence, or its predecessor's due diligence, and a built version of these homes, or a cut sheet, you know, marketing materials marketing these homes, you don't know where these homes are being marketed. So you don't know where the marketing materials would have been going. And so there's no evidence that would allow a jury to make a reasonable inference of access. Well, didn't Mr. Snodgrass find at least two of these houses built in the Charlotte area? No, Your Honor. Again, the only evidence is that there are photographs that were in building graphics files of built versions of the homes. But Mr. Snodgrass went looking for built versions because he thought that there was infringement when he saw the homes that the plaintiffs were building. He drove around all over Charlotte looking for them. According to his testimony, he couldn't find one. So what they want is for the court to infer that somehow the due diligence scouts for our clients found something that the plaintiff's representative who designed these plans was unable to find. With respect to the issue of the Internet, the plaintiff, the way they try to bring Lenar close to their plans on the Internet is they pointed specifically to testimony from Lenar's 36th representative that when they're doing the scouting process, they would look at competitor homes online. But that very testimony that they relied upon limited that hunt to homes being offered by competitive builders. And he specifically stated in his testimony that they did not look at websites of architects when they were conducting that kind of search. And so, again, that does not square the circle that you have to square in order to satisfy your burden. They also talk about John Gardner's testimony, and he talked about looking at architects' plans but only plan books and not on the Internet. So, again, they fail to square the circle. The final point with respect to this independent creation argument is that how or if our clients came into possession of a third-party architect's plan, the Fairfax plan, has no bearing on this central issue on whether the path of the infringed works, the Chadwick, the Ballantrae, the Springfield, came into the pathway of the people who were out there scouting before this new design was created by the defendants. You're saying that wouldn't even be circumstantial evidence that could bear on the issue of access. That would have to be your position, wouldn't it? It's a different plan, and so it doesn't make it more or less likely that our clients saw the plaintiff's plans. It's a completely different plan, and whether or not they had access to that and when has no bearing on that issue. The only way it could have bearing, again, is this credibility determination, and we've cited the court to the Tomasini case where the court specifically said that just attacking the credibility of the witness is not sufficient. Well, what would it be relevant to? Are you saying it would be relevant to substantial similarity? It's got to be relevant to something. It would be relevant to if they established a reasonable access, if they met their prima facie burden on reasonable access, then the defendants would have the opportunity to rebut that with evidence of independent creation, and the evidence about the fair facts would enable the defendants to establish that defense, and what the district court held was that because there's this gap in that independent creation evidence, we would not be able to satisfy our burden at summary judgment to meet that defense. You're saying it can negate already established access, but it can't stand on its own to establish access. That's correct, Your Honor. Do you agree that the issue of access pretty much boils down to that question, what weight we put on this negation, because otherwise you've got the Internet, you've got some issues, I mean some evidence, but... I'm not sure I understand the question. Our belief is that they failed to satisfy their prima facie... I think the plaintiff is suggesting that this negative evidence regarding independent creation puts it over the threshold that they need to get their issue into court, into trial, and do you agree that that's what separates this case? I mean that that's the definitive issue that we have to decide regarding access. What weight, if any, does the negating of independent creation, what weight is that given in the initial access determination? You're saying zero, and she's saying yes, and what I'm thinking hearing the two of you is that this is going to be a pretty big part of this court's determination whether access was established, and do you agree? Certainly the weight that you give to the independent creation evidence is important, but we do believe that if you compare this case to the other reported cases that deal with the sufficiency of access, evidence of access, that this case falls squarely within the factual realm of cases that have decided that summary judgment is appropriate, and I refer specifically to the Alehouse case, to the Artitax case, and to the Tolar v. Sayles case that was cited there. The facts of this fall within that, and the Tomasini case also deals with this issue of the credibility of the denials and the court-granted summary judgment there as well. Thank you, Mr. Stevens. Mr. Wright? May it please the Court, my name is Tom Wright, and I will be addressing the issues related to the trial court's determination that there is no substantial similarity between the plans at issue in this case. To begin with, in that regard, the trial court did nothing wrong, and in fact a reading of the record and the order indicates that both prongs of this case circuit's two-prong substantial similarity test were conducted. Where was there an intrinsic analysis conducted by the court? Well, it says, I believe it was, well, the court refers to viewing the works as an ordinary observer in the joint appendix at 730. So the way it came down was they did the initial extrinsic analysis where dissection is appropriate. So the court, looking for the similarities that... How is this case, I realize that Charles Ross Builders is not binding precedent because it's not published, but how is this case analytically any different from Charles Ross Builders on the issue of substantial similarity? I don't think that it differs a great deal in Charles Ross... It's the same, isn't it? I think so, because, and there the court, the issue with intervest, which has been raised by the appellant in this case. In Charles Ross, Your Honor wrote, acknowledged the intervest holding that architectural work could be viewed as compilations due to the fact that they are composed of largely pre-existing elements that are arranged in a different way. And in fact, in footnote 5, the last footnote, on remand in that case, the court directed the trial court to consider the thinness, which is the intervest discussion of compilations, in performing this circuit's two-pronged test. So, as I said, I think the emphasis on differences as opposed to similarities are really two sides of the same coin. If you do an analysis, if you compare two plans, you will either find similarities or differences. If you set out to find similarities but there are differences, that's what ultimately pertains. In this case, the trial court looked at a lot of things for similarities. In fact, they looked at the footprint, the square footage, the windows, the entries, the room placement, the fireplace placement, the size of the foyer and the hall, the roof lines, the materials used in the trim, and found all of those to be different. The fact that they found them to be different doesn't mean that they didn't look for similarities, but you can't find similarities that don't exist. And, in fact, this court... The most striking thing about the... I'm not striking in the sense of striking similarity, but this is one of the most unique things about the Springfield design, that it has these sort of four layers of front that go back, and both the Springfield and your client's Hampton plan have almost identical shapes in the front. Yes, Your Honor, but when you look at the plans themselves, you see that the footprint, while it looks that way subjectively, objectively it is not substantially similar. And you're performing precisely the analysis that Building Graphics hopes for, which is to jump the extrinsic analysis and ignore all of the facially obvious differences that exist to get to a much more subjective analysis and say, well, they look sort of similar. And that's the very purpose of the objective test, is to make sure that there is an objective basis for believing that there has been copying before you move to the much more subjective intrinsic analysis. Well, but isn't certainly the stair-stepping of the front facade of the house, it's like it's the signature of that design. Doesn't that count for a lot in terms of similarity? Yeah, the doors are different, the windows have different volumes, but doesn't it count for a lot that it's... Well, it may count for some, but it does not, I mean, there's no evidence in the record that in fact that that particular feature is original to Building Graphics. In other words, in treating these plans as compilations of pre-existing features, that sort of facade can be found in other plans. And so... Is there any evidence about that? No. I don't believe there's any specific evidence about other plans with that footprint, or with that outline, although the Fairfax plan is in the record, and it may not... Well, the floor plan is, I'm not sure that the elevation is. What about the coins? What about the coins? Oh, the coins at the... Well, again, these are small individual elements, and we're not saying that the plans themselves bear, that there's nothing in the plans that reminds one of the other, but those are all well-established pre-existing architectural elements that you can find in any of the plans that are in the record, and I think that that's... I looked at your website. Excuse me? I looked at your website. I couldn't find any other coins. I can't... Well, I don't think, and perhaps Ms. Cole will set me straight, I don't think Frank Snodgrass claims to have invented the coin, and with all due deference, sir, I'm pretty sure I can find a Lenar home that's got a coin or two in it, or on it, but I think this... It cost a few coins, I'm sure. But I think this is a good... This discussion of both the front aspect and the coins exemplifies the importance of the objective test, which is not to get bogged down in minutia. Minutia? The front of the building? That's not minutia. I even noticed it. Minutia may be too strong a word. Any individual aspect to establish copying, since the plans as a whole are what is protected, not simply the front, and that's why it's substantial similarity. It's not similarity of a piece here and a piece there. That's why, as I said, this court has said that a list of similarities scattered throughout the plans is inherently subjective and unreliable. I believe that's Towler at 584. So, as I said, the list of differences is exhaustive, and the list of similarities much smaller. And at the end of the day, the trial court, I think, appropriately determined that based on the balance of those, that there is no indicia that one plan was copied to create the other, which is the bottom line here. Your honors have no further questions? Thank you very much. Thanks. Ms. Wright. If I might first respond briefly to some of the points raised regarding access in this case. Several of the arguments we heard from counsel of appellees we would submit certainly support the notion that there's a tribal question of fact here for the jury. For example, they want to point to testimony from Lenar's 30B6 representative that their review of home plans was limited to those of competitive builders online. At the same time, however, there is conflicting testimony from John Gardner, an individual who was employed by three of the home building entities at issue in this case at different times in his career, and has knowledge more consistent in time with the due diligence that went on here. And his testimony regarding review of architects was not precisely limited only to home plan books, as referenced by appellees. My point here is that when we start to get down into the weeds on facts like this, it reiterates the point that there's a genuine issue of material fact here to be cited by a jury, a jury who's to make credibility determinations. Well, isn't it all speculation? They could have driven around and found some of these houses. They could have stumbled onto the plans on the Internet. They could have seen some brochures on it. But, I mean, even all those things put together make it still a needle in a haystack to find this plan, don't they? I understand your view, and that may be partially informed by many of the cases that the district court here relied on and a lot of the cases regarding access that we see where the plaintiff merely asserts that its plans were available somewhere, and so surely the defendant must have stumbled upon them. Here, distinctly in this case, we have defendants appellees who were out looking for plans like these in the very places where building graphics plans would have been found. We think that this distinguishes the case here because, again, they were out looking for these types of plans and there is undisputed, and in some senses perhaps conflicting, but, again, that suggests a jury question, evidence regarding exactly where they were looking many times in places where building graphics plans were, in fact, found. So the cases like Ale House and Art Attacks and those cited by appellees, again, are instances in which the defendant was perhaps copied some other work, perhaps created it in their head. There's no real evidence about how they created it, and the plaintiff's plan was merely available somewhere. There was no further evidence showing a reasonable possibility, not an actuality per se, but a reasonable possibility that the paths of the infringer and the infringed work crossed. And we submit that we certainly have enough here to, at a minimum, cross the summary judgment threshold, especially when viewing all facts in the light most favorable to building graphics. On that point, I would note that, as this Court stated in the Campbell v. Hewitt case, on summary judgment, a court should not grant summary judgment unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances. And we submit that the evidence here, when viewing that standard, again, as must be done in the light most favorable to the nonmovent, shows that this matter should be tried to a jury. At the same time, a jury's got to have sufficient evidence such that, by a preponderance of the evidence, there was reasonable opportunity. Correct? Yes, Your Honor. We don't dispute that. And so I'm struggling here. Why isn't this simply evidence in equipose on the issue of reasonable access? Well, for purposes of summary judgment, I would say that if we're coming to a question of drawing the line, then that necessarily implicates the role of a jury to view the testimony of witnesses like John Gardner and their 30B6 representative and the documentary evidence showing where these plans were available and where they went looking to determine... But what did Gardner say that would justify a reasonable juror saying, ah, he said that, that's enough for preponderance? Absolutely. For example... Can you give us a quote? Sure. Well, I can come close to quoting it, if I might, from my memory. The testimony of John Gardner established that UDC Homes, who is the home builder for whom Plaintiff's Chadwick Plan was designed, was a direct competitor of Don Galloway, Lenar's local predecessor. And it's undisputed that both Don Galloway and Lenar, during due diligence, looked at the home plans of their competitors. John Gardner also backed up the testimony regarding reviewing the plans of local architects. And there's lots of testimony in the record regarding the respect and renown, if you will, of Frank Snodgrass as an architect in the Charlotte market. Does... I'm sorry. No, go ahead. The problem I'm having with this argument is the killer brass analysis. It seems to me that the killer brass analysis is saying that negative evidence of independent creation goes to show... may ultimately go to show that the design was copied, but that it doesn't go to the issue of access. It doesn't flat-out say that. The case does not say that it doesn't go to the issue of access, but it does say that it has evidentiary weight for whether the design was copied. So you're referring to the issue of Apelli's contention that they copied the Fairfax pre-existing plan? Right. I'm certainly not representing that Keillor stands for anything different than how you summarized it. We instead are referring to the factual notion that we believe a jury should be entitled to consider regarding the credibility of their denials regarding access in light of, frankly, the falsity of that story. And this court in Tallerby Sales noted that on the issue of access, when considering the defendant's denial, the issue of whether there's any evidence calling into question the defendant's credibility is relevant on that point. I guess what I'm thinking in my mind is you are really asking us to extend the law here a little bit, aren't you? I believe that this is a reasonable interpretation of existing law based on these facts. I don't dispute that this set of facts that we have here is not precisely analogous to any that's been before this court before, but I don't believe that it would represent a change in the law. I think we're simply arguing that certainly these facts... Expanding the evidentiary weight of negation of evidence of independent creation. Well, simply given the fact that we believe the law is clear that this can be used to call into question their credibility, especially when we have an admission that they copied something else. In many cases, an alleged infringer created something in his home office, sort of shut off from the world, creating it out of his head. Here we have an admission that they created it with reliance on some preexisting plan. Again, we believe that the totality of this evidence creates a tribal issue for the jury, and we respectfully request that the court reverse and remand on access and substantial similarity. Thank you. Thank you very much. We'll come down in Greek Council and take a very brief recess before proceeding to the third case.
judges: Andre M. Davis, Barbara Milano Keenan, John A. Gibney, Jr.